* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of the Deputy Commissioner, with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer/employee relationship existed between the parties at all times relevant herein.
3. Employer-defendant is self-insured with Key Risk Management Services, Inc. as the administrator.
4. The parties stipulated into evidence as Stipulated Exhibit # 1, a pre-trial agreement.
5. The parties stipulated into evidence as Stipulated Exhibit # 2, Medical Records.
6. The parties stipulated into evidence as Stipulated Exhibit # 3, Industrial Commission Forms.
The parties failed to stipulate to plaintiff's average weekly wage.
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 52 years of age. She has a bachelor's degree and has taken courses toward a master's degree. She was employed as a Spanish teacher at Caswell County Schools for approximately 44 days at the beginning of the 2002-2003 school year.
2. Plaintiff alleges that on September 4, 2002, she suffered a cerebral vascular accident (stroke) as a result of stress she experienced from her employment.
3. Plaintiff presented to Dr. John Whelan, an internist, on September 25, 2002, who began treating her for uncontrolled diabetes and hypertension.
4. According to plaintiff, she suffered stress as a result of the following: (1) A student popping gum and being disruptive in class; (2) Her class not being on task and on schedule; (3) The assistant principal approaching her in the parking lot after school hours, which she defined as harassment; (4) The scheduling of a parent/student conference without her input and without consideration of her other job; (5) Her salary being unknown to her as certification had not been finalized; (6) It being near the end of the month, near time to pay bills, and not knowing how much money she would have; (7) The school system taking a long time explaining the certification process to her; (8) The school system asking her to look up things she felt they should be doing; and (9) Her suffering angst that her first teacher observation was unannounced, despite the fact that she had been teaching in excess of thirteen years.
5. According to plaintiff's testimony, she currently has memory and speech problems as well as trouble concentrating. During plaintiff's testimony at the hearing before the Deputy Commissioner, the Deputy Commissioner did not observe any difficulty in her speech and found that plaintiff appeared to fully understand the questions and respond appropriately with coherent answers.
6. On December 13, 2002, plaintiff presented to Dr. Michael F. Zelson, a clinical psychologist who specializes in working with people who have suffered neurological injuries, such as a stroke. In his deposition testimony Dr. Zelson stated that he saw no evidence of memory problems, and that plaintiff did not have any problems recounting the recent events or discussions they had in past sessions.
7. Dr. Michael Zelson had the opportunity to observe whether plaintiff's speech was actually slow during the interview in which she stated she was having problems, but he did not witness any speech difficulties. According to Dr. Zelson's testimony, he neither saw nor heard any slurred speech or stuttering during his visits with plaintiff.
8. Dr. Michael Zelson diagnosed plaintiff with adjustment disorder with anxious and depressed mood. According to Dr. Zelson, an adjustment disorder is an emotional reaction to an identifiable condition or stressor that is beyond what is typically expected. An adjustment disorder with anxious and depressed features means that the person is dealing with symptoms of anxiety and depressed mood in a reaction to that stressor.
9. Based on a hypothetical question, Dr. Zelson opined, "to a reasonable degree of psychological certainty, I think that her adjustment disorder can be attributed to the events described. I can't attribute, though, her stroke to the events described." He admitted that his diagnosis of adjustment disorder with anxious, depressed mood was based solely on what was reported to him by the employee and not on any objective information.
10. Dr. Zelson opined that plaintiff "seemed to be exaggerating the stroke-related deficits resulting in decreased self-confidence" and that plaintiff could work and function quite well without the need for medication.
11. Dr. Zelson further opined, "There is a difference in my perception of her and her self-report. She had spoken of speech problems that I had not observed, and my conclusion was that she was exaggerating the problems; because I did not observe them even in the session that she was discussing how poor her speech was."
12. The evidence of record revealed that Dr. Zelson, upon request of plaintiff, refused to write a letter stating that her stress caused or contributed to her having a stroke because he could not support it factually. As a result, plaintiff became upset with Dr. Zelson and did not return for further treatment.
13. Dr. Whelan was also asked by plaintiff to write a letter regarding causation in support of her workers' compensation claim. According to Dr. Whelan's testimony, he essentially recounted her basic history based on plaintiff's recollection of what happened prior to her stroke.
14. In Dr. Whelan's letter dated April 9, 2003, he opined that plaintiff was suffering from extreme job stress with associated exacerbation of her hypertension, and for this reason her stroke may well be work-related. However, according to Dr. Whelan's testimony, his opinion was based on information he received from the employee, and not on anything of which he had independent knowledge. Dr. Whelan also believed Dr. Zelson had opined that it would be untenable for plaintiff to return to teaching. Dr. Whelan admitted that he had not diagnosed plaintiff as suffering from stress, and any mention he made of stress-related problems were based on what plaintiff told him and not on any medical records that could substantiate it.
15. Dr. Whelan opined that plaintiff "may never recover her normal speech and may be permanently disabled from teaching." He admittedly based this opinion on the information given to him by plaintiff that as a result of her continued problems with her speech, she was not capable of returning to her teaching position. Again, Dr. Whelan's opinions were derived primarily from the information provided him by plaintiff and not from any independent knowledge. He did not have the speech therapy notes, or the notes from Dr. Zelson when he wrote his April 9, 2003 letter.
16. Based on plaintiff's statement that Dr. Zelson did not want plaintiff to return to work and her continued complaints of speech difficulties, Dr. Whelan agreed that it was reasonable for her to be out of work. Dr. Whelan testified that his opinion was based on the history that plaintiff had given him. Dr. Whelan testified that he was not aware that plaintiff had asked Dr. Zelson to write a causation letter, and Dr. Zelson had refused because he could not relate plaintiff's stroke to her claim of stress.
17. The evidence revealed, and Dr. Whelan was surprised to learn at his deposition, that Dr. Zelson never told plaintiff that it would be stressful to return to work. To the contrary, Dr. Zelson told plaintiff that she was capable of returning to work.
18. Dr. Whelan was further surprised to find out that plaintiff had previously been diagnosed with stress, or that she had brothers who suffered from strokes, as she had omitted that information from her medical history.
19. Dr. Whelan would not opine to a reasonable degree of medical certainty whether plaintiff's alleged stress was related to her stroke. He stated it was a possibility, considering her elevated blood pressure. However, in making that primary connection between stress and increased blood pressure, then leading to a stroke, Dr. Whelan was not willing to say that it was probable that the stroke could be considered work-related. He felt that the other risk factors that plaintiff had were the more clearly established risk factors resulting in a stroke, than her alleged stress.
20. The Full Commission finds Dr. Whelan's opinion that plaintiff's stroke was possibly, but not probably, related to her work to be insufficient to find that it was the result of her employment with defendant-employer.
21. While Dr. Zelson could not opine as to what caused the plaintiff's stroke, he was able to state that some of the risk factors for stroke are age, hypertension, diabetes, obesity, smoking and alcohol use. The evidence revealed that plaintiff suffered from numerous health issues, which were significant risk factors for stroke. Specifically, the medical evidence revealed that plaintiff had a history of hypertension in her family. Her father suffered from coronary artery disease, hypertension and diabetes. The medical records also revealed that four of plaintiff's brothers had had a stroke. Plaintiff was previously diagnosed with hypertension, and poorly controlled diabetes. She had a history of alcohol, cigarette and marijuana use, and was classified as obese. Additionally, it was noted by the doctor at Duke University Medical Center that plaintiff was not taking her proper diabetes medications prior to her stroke. She had been made aware of the importance of taking her medication, and the link between diabetes and stoke. The evidence failed to show that plaintiff's alleged work-related stress resulted in elevated blood pressure, and that elevated blood pressure resulted in a stroke.
22. On the date of her stroke, plaintiff's toxicology report revealed that her urine sample was positive for marijuana. According to plaintiff's testimony at the hearing before the Deputy Commissioner, she probably had used marijuana on the weekend prior but smoked marijuana to help with her headaches. She testified that a doctor in Washington, D.C. prescribed the marijuana for her.
23. Regarding plaintiff's drug use, Dr. Whelan testified that he was surprised plaintiff had a positive toxicology screen for marijuana. Dr. Whelan opined that the use of marijuana can increase anxiety and panic and could explain plaintiff's exaggerated reactions to the incidents she described at school.
24. According to Dr. Whelan' testimony, plaintiff was suffering from type II diabetes, and that patients with this type of diabetes are at increased risk for stroke. Compared to the general population, they have about twice the risk of a stroke. Dr. Whelan agreed that there are many causes of stroke, including high blood pressure, smoking, diabetes, high cholesterol, and family history. While Dr. Whelan opined stress was a possible secondary risk factor for stroke if it led to an elevated blood pressure, he felt that the plaintiff had more significant and direct risk factors. He opined that plaintiff was suffering from diabetes type II, hypertension, and a strong family history of stroke. All of these made the risk of plaintiff having a stroke, even greater than twice that of the general population.
25. Although teaching can and may have exposed plaintiff to stress, plaintiff has failed to present sufficient evidence to support her claim that her alleged stress resulted from causes and conditions characteristic of and peculiar to her employment as a teacher, or that her employment as a teacher exposed her to a greater risk of contracting stress than the public in general. Any employee, not just a teacher, may have anxiety and concerns about performing a job, the people with whom they work and financial worries regarding salary. Furthermore, plaintiff failed to produce any credible evidence from other teachers that indicated they also suffered stress as a result of their job duties with defendant-employer that was characteristic and peculiar to their employment.
26. The greater weight of the competent medical evidence of record does not establish that plaintiff was either placed at increased risk of developing stress as a result of her job duties as a teacher with defendant-employer or that her job was a significant contributing factor towards the development of stress.
27. The evidence revealed that plaintiff had problems in general dealing with perceived stress at work. Plaintiff stated that she left her employment at Baccus Middle School in Washington, D.C. at the recommendation of Dr. Ferguson, who told her that she was suffering from diabetes and high blood pressure as a result of stress. No medical records were presented to support this diagnosis. In a note dated April 13, 2002, Dr. Whelan noted that plaintiff stated she tried to do some tutoring at a local church-school, but found this to be too stressful, noting that it caused increased fatigue and anxiety.
28. Plaintiff had worked for defendant-employer for only 44 days before she alleged that the stress was so severe that it resulted in her stroke. The evidence of record shows that in 30 years of employment, plaintiff had approximately 23 jobs, 22 of those jobs occurring in a in 24 year span of time.
29. Based on the greater weight of the competent evidence, the Full Commission finds that any stressors that plaintiff attributed to her job with defendant-employer are not characteristic of the work of teaching as opposed to occupations in general and that her employment as a teacher did not place her at an increased risk of having a stroke as opposed to the general public not so employed.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Under the Workers' Compensation Act, in order to receive any benefits, the claimant bears the burden of presenting credible and convincing evidence to prove each and every aspect of her claim by a preponderance of the evidence. See Causby v. Bernhardt FurnitureCo., 83 N.C. App. 650 (1986); Blalock v. Roberts Co., 12 N.C. App. 499
(1971). Specifically, plaintiff bears "the burden of proving each and every element of compensability." Harvey v. Raleigh Police Dept.,96 N.C. App. 28, 35, 384 S.E.2d 549, 553 (1989).
2. An occupational disease is defined as "[a]ny disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." N.C. Gen. Stat. § 97-53(13). "The claimant bears the burden of proving the existence of an occupational disease." Norris v. Drexel Heritage Furnishings, Inc.,139 N.C. App. 620, 621 534 S.E.2d 259,261 (2000), cert. denied,353 N.C. 378, 547 S.E.2d 15 (2001).
3. "A disease is `characteristic' of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question." Booker v. Duke MedicalCenter, 297 N.C. 458, 472, 256 S.E.2d 189, 198 (1979). "[O]rdinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded."Rutledge v. Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In order to prove the first two elements of N.C. Gen. Stat. § 97-53(13), an employee must demonstrate that, "as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally." Id. at 93-94, 301 S.E.2d at 365. In addition, "the final requirement in establishing a compensable claim under subsection (13) is proof of causation." Booker, 297 N.C. at 475, 256 S.E.2d at 200. To establish the causation element, an employee must prove that the employment "significantly contributed to, or was a significant causal factor in, the disease's development." Rutledge, 308 N.C. at 101,301 S.E.2d at 369. Plaintiff has failed to show that her stress resulted from causes and conditions characteristic of and peculiar to her employment as a teacher, or that her employment as a teacher exposed her to a greater risk of contracting stress than the public generally. Rather, the evidence reveals that the alleged stress that plaintiff suffered is an ordinary disease of life to which the general public is equally exposed.
4. When the medical evidence produced raises no more than a possibility that the stated injury was produced by the stated cause, the Industrial Commission has every right, and indeed the obligation, to refuse to consider that evidence as sufficient to support an award.Phillips v. U.S. Air, Inc., 463 S.E.2d 259, 120 N.C.APP. 538 (1995). In this case, Dr. Whelan's opinion that the stroke was possibly, but not probably, related to employee's work, is insufficient to support an award of benefits.
5. Plaintiff is therefore not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
AWARD
1. Under the law, plaintiff's claim must be, and hereby is DENIED.
2. Each side shall bear its own costs.
This the ___ day of November 2006.
 S/_____________________________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_____________________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________________________ BUCK LATTIMORE CHAIRMAN